**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**INJUNCTIVE RELIEF SOUGHT**

**RAYMOND LUTZEN; and PAMELA LUTZEN**,

**JURY TRIAL REQUESTED**

Plaintiffs

Case No.  3:15-cv-704-BJD-PDB

v.

**NATIONSTAR MORTGAGE LLC; and FEDERAL**
**NATIONAL MORTGAGE ASSOCIATION**,

Defendants.

_____/

## AMENDED COMPLAINT AND JURY TRIAL DEMAND

**COME NOW**, Plaintiffs, **Raymond Lutzen and Pamela Lutzen** ("Plaintiffs") by and through the undersigned counsel, sue Defendants, **Nationstar Mortgage LLC** ("Nationstar"), **Federal National Mortgage Association** ("FNMA") (collectively "Defendants"), and allege:

## PARTIES, JURISDICTION, AND VENUE

1.      Jurisdiction of this Court arises under 28 U.S.C. § 1331 and pursuant to 15 U.S.C. § 1692k(d), 12 U.S.C. § 2614, and pursuant to 28 U.S.C. § 1367 for pendent state law claims.

2.      Plaintiffs are natural persons who reside in Duval County, Florida, and are persons with standing to bring a claim by virtue of being directly affected by violations of various statutes in Duval County, Florida, as alleged below.

3.      Nationstar is a foreign limited liability company, and at all times material, provided financial services to individuals and consumers residing in Florida, including Plaintiffs, was registered to conduct business in Florida, and maintained agents for the transaction of its customary business in Duval County, Florida.

4.      FNMA is a shareholder-owned, government-sponsored association chartered by Congress, headquartered in the District of Columbia, and the transactions, acts, practices and courses of business alleged herein occurred within Duval County Florida.

5.      Venue is proper in the Middle District of Florida because the acts and transactions occurred here, Plaintiffs reside here, and Defendants transacts business here.

## FACTS

6.      Bank of America, N.A. ("BANA") filed a mortgage foreclosure action in the Fourth Judicial Circuit in and for Duval County, Florida on August 20, 2012 ("Foreclosure Action"), with respect to Plaintiffs' primary, Duval County Residence ("Subject Property"), which secured a loan for money the use of which was for personal and household purposes ("Subject Loan" attached as "Exhibit A").

7.      BANA alleged in the Foreclosure Action that Plaintiffs defaulted on the Subject Loan on April 1, 2012.  Plaintiffs did in fact default on the Subject Loan on April 1, 2012, as a result of financial hardship.

8.      Nationstar began servicing the Subject Loan on or about May 13, 2013, and Nationstar is the servicer of the Subject Loan.

9.      FNMA was the assignee and owner of the Subject Loan at all times material to this Action.

10.     Plaintiffs did not cure the delinquency on the Subject Loan until May 30, 2014.

11.     As such, Nationstar began servicing the Subject Loan while it was in default.

12.     Plaintiffs and Nationstar entered into a Loan Modification Agreement, effective May 30, 2014 ("LMA" attached as "Exhibit B"), which provided for an "Unpaid Principal Balance" of

$249,986.99, which consisted of "the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized."

13.     The LMA provided that Plaintiffs pay $1,529.73 per month, consisting of principal, interest, and escrow for taxes and insurance.

14.     Plaintiffs paid as agreed.

15.     However, despite Plaintiffs timely paying the proper monthly payment, Nationstar did not apply Plaintiffs' October 2014 payment to principal, interest, and escrow, but rather, applied the payment to the "suspense account."

16.     Plaintiffs timely sent another mortgage payment for the proper monthly amount in November 2014, which Nationstar applied to Plaintiffs' October payment.

17.     Plaintiffs timely sent payments for the proper monthly amount to Nationstar in December 2014 and January 2015, which were showing "still in process," instead of being applied, according to Nationstar's customer service representative.

18.     Plaintiffs received a January 2015 statement alleging a "past due" amount of $6,118.92 and legal fees of $741 (Page 2 shows an itemized list of entries which include 35 entries for legal fees).  The past due amount and legal fees are improper and unauthorized.

19.     Plaintiffs also received a letter from Nationstar dated January 23, 2015, which stated that Plaintiffs' loan "is currently in the Foreclosure process" because Plaintiffs were 83 days behind on payments.  These letters are erroneous because Plaintiffs made all payments.

20.     On January 30, 2015, Plaintiffs sent to Nationstar their February 2015 payment for the proper monthly amount.  On February 15, 2015, since Nationstar never cashed the December 2014 and January 2015 checks, Plaintiffs put a "stop payment" on the checks, re-issued two new

replacement checks, and sent them to Nationstar via certified mail.  Nationstar cashed one of the checks but misplaced the other one.

21.     On February 26, 2015, Plaintiffs received a certified letter from Nationstar dated February 20, 2015.  This letter stated that Plaintiffs were in default, that Plaintiffs had not made payments since December 1, 2014, and that Plaintiffs were past due in the amount of $4,702.45.

22.     In March of 2015, Nationstar refunded $3,703.53 to Plaintiffs, which amount has no apparent discernable justification.  Then Nationstar stopped payment on the check, and applied the funds to improper fees and costs.

23.     Plaintiffs sent a Notice of Error to Nationstar, which Nationstar received on March 25, 2015, outlining these issues, and stating that Plaintiffs have the willingness and ability to come current on the Subject Loan, and requesting that Nationstar review the transaction history to correct the error.

24.     Plaintiffs received a letter from Nationstar on April 3, 2015, which was dated March 26, 2015, acknowledging the notice of error.

25.     On June 1, 2015, Plaintiffs received a letter from Nationstar dated May 26, 2015 ("Notice of Error Response"), stating that the error of which Plaintiffs complained did not occur, recognizing the LMA, and stating that payments previously remitted have been applied correctly.

26.     The Notice of Error Response Letter was not provided to Plaintiffs within 30 days of receipt of the Notice of Error in violation of federal law as described below.

27.     Further, the Notice of Error Response Letter states, "However, as of May 12, 2015, the account is contractually due for the February 1, 2015 monthly installment.  The amount needed to reinstate or to bring the account current is $6,502.56."  This is false because Nationstar received a payment in March 2015, and further it is a misrepresentation because this amount includes improper

and unjustified foreclosure fees, property inspections, late fees, and other various improper charges; and the deficiency is a result of Nationstar's misapplication of payments that it says did not occur.

28.     As such, Nationstar did not complete a good-faith, legitimate investigation of Plaintiffs' Notice of Error, but rather stated that the error did not occur and that Plaintiffs were in default.

29.     From the time that Nationstar began misapplying payments to the present, Plaintiffs have received statements and demands for payment attempting to collect improper and unauthorized foreclosure fees, property inspection fees, and late fees; and containing improper statements such as:

a.   "your mortgage loan payment is past due, and your property may be referred to foreclosure fourteen (14) days after the date of this letter.";

b.   "You may be able to avoid foreclosure by paying the total amount necessary to bring the account current . . . , obtaining a loan modification, or selling your house through a short sale approved by us.";

c.   "[This letter] also spells out, in legal terms, why we are moving forward with the foreclosure process and what you may do in response.";

d.   "Because you have not fulfilled the terms of this agreement, Nationstar intends to initiate foreclosure action on the mortgage property.  The foreclosure will be conducted in the name of Nationstar Mortgage LLC.";

e.   "The total amount needed to reinstate or to bring the account current  is $6,502.56";

30.     Nationstar's communications to Plaintiffs consistently state that Nationstar is a debt collector.

31.     Nationstar calls Plaintiffs once or twice per day, urging them to call Nationstar so that they can work out a plan to avoid foreclosure.

32.     Mrs. Lutzen started seeing a doctor because she usually took care of tasks such as dealing with a loan servicer, but it became overwhelming because there is no way to sort through all of Nationstar's conflicting information and unjustified and questionable actions—for example, she cannot make payments online because Nationstar has the Subject Loan in default status, so she has to call and argue with representatives to take her payment.  Sometimes it would take days to make a payment because multiple attempts were necessary.  She has lost weight, and suffers from sleeplessness and anxiety as a result of constant worrying about Nationstar filing a foreclosure action.

33.     Mr. Lutzen has found it difficult to concentrate on his job and studying for firefighter exams because he was preoccupied with whether his home would be foreclosed upon, to the extent he saw a doctor to consult about the issue.

34.     The quality of Plaintiffs' marriage has decreased because of how the issues described herein.

35.     Plaintiffs received letters from Nan Ness Law Firm dated June 4, 2015, stating, "Nationstar . . . has referred your loan to Van Ness Law Firm, PLC to initiate foreclosure proceedings"; and the current unpaid principal balance on the loan is $248,708.67."

36.     Nationstar has not provided periodic statements to Plaintiffs since June of 2015.

37.     Plaintiffs have performed all conditions precedent to bringing this Action.

## CAUSES OF ACTION

## COUNT I:  VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA")—12 C.F.R. § 1024.35—AGAINST NATIONSTAR

38.     Plaintiffs re-allege Paragraphs 1-37 here.

39.     At all times material, Nationstar was a "servicer," as Nationstar was the person responsible for servicing Plaintiffs' mortgage loan.

40.     At all times material, Nationstar was engaged in "servicing" as Nationstar was the servicer designated to receive scheduled periodic payments from Plaintiffs pursuant to the terms of the Subject Loan and LMA.

41.     Plaintiffs' Notice of Error was/is a written notice from Plaintiffs, who are borrowers, including the borrowers' names, and information that enables Nationstar to identify Plaintiffs' mortgage loan account, and which identify the error Plaintiffs sought to avoid.  § 1024.35(a).

42.     Nationstar violated § 1024.35(e)(1)(i), by failing to correct the errors identified in the Notice of Error and to provide written notification of the corrections, the effective date of the corrections, and contact information; and by failing to conduct a reasonable investigation and to provide Plaintiffs with a written notification that includes a statement that Nationstar determined that no error occurred, the reason for the determination, and so on.  Instead, Nationstar stated that the error did not occur, that Plaintiffs were in default and responsible for Nationstar's error, and requesting a sum of money that included improper foreclosure fees, late fees, property inspections, and so on.

43.     Nationstar was required to conduct such error resolution within 30 days of receipt of the Notice of Error.  § 1024.35(e)(3)(i).  Nationstar failed to do so.

44.     As a proximate result of Nationstar's actions and omissions, Plaintiffs have suffered actual damages in the form of improper and un-owed fees and charges, such as late charges and property inspections, accrued interest as a result of principle not being paid as it would have been paid if Nationstar followed the loan documents.

45.     Plaintiffs have also suffered actual damages in the form of emotional distress and loss of consortium.

46.     Nationstar has a pattern and practice of failing to comply with the RESPA.  For example:

a.   Nationstar's error resolution process has an error in it wherein letters are actually mailed days after they are written so that the date appearing on the face of any given letter, and the date on which postage is placed, is often days prior to the date on which Nationstar actually mails the letters, thereby causing a systematic failure of Nationstar to timely comply with RESPA's error resolution time requirements, which systematic failure represents numerous consumers.

b.   Nationstar failed to properly investigate and/or reconcile the concerns from within Plaintiffs' Notice of Error.

c.   Nationstar failed to timely respond within 30 days of receipt of the Notice of Error.

d.   Nationstar failed to timely and properly respond to a Notice of Error provided by borrowers John Croston and Connie Croston for a loan in Clay County, Florida.

e.   Nationstar failed to timely acknowledge notices of error on two separate occasions, and failed to properly investigate and correct the errors identified in one of those notices of error in Gibbons v. Nationstar, M.D. Fla. Case No. 3:14-cv-1315.

f.   From October 1, 2014 to the date on which Plaintiffs filed this action—the time during which the wrongful actions have occurred—2,697 consumer complaints have been filed with the Consumer Financial Protection Bureau.

g.   New York financial regulator, Benjamin Lawsky, of the New York Department of Financial Institution, is probing the business practices of Nationstar Mortgage Holdings, Inc., seeking information about the company's servicing portfolio, staffing levels, recent acquisitions, and vendor relations, as a result of receiving hundreds of complaints from New York consumers about Nationstar's mortgage practices,

including problems related to mortgage modifications, improper fees, and lost paperwork.

h.  In <u>Berne et al. v. Nationstar Mortgage</u>, No. 14-CV-61153 RNS, Nationstar failed to properly investigate and address a notice of error.

i.  In <u>Nugen, et al. v. Nationstar Mortgage</u>, No. 14-CV-62138 DPG, Nationstar failed to properly investigate and address a notice of error.

j.  In <u>Russell v. Nationstar Mortgage, LLC</u>, No. 14-cv-61977-CIV, 2015 WL 541893 (S.D. Fla. Feb. 10, 2015), the Southern District found that Nationstar failed to adequately respond to two Qualified Written Requests.

k.  In <u>Clifton v. Nationstar Mortgage LLC</u>, No. 3:11-cv-50-CMC, 2011 WL 891317, (D. S.C. Mar. 11, 2011), the court found that Nationstar failed to timely respond to two Qualified Written Requests.

l.  Based upon information and belief, consumers Mark Baker and Kiriaki Baker, residents of Hoffman Estates, Illinois, wrote to Nationstar in the form of a qualified written request regarding Nationstar's improper servicing of a reaffirmation of a loan modification.  Nationstar timely acknowledged receipt of the QWR but failed to provide investigation results or to fix the problem.  This is the subject matter of the case <u>Baker v. Nationstar Mortgage, LLC</u>, et al., No. 1:14-cv-7131, N.D. Ill.

m. Based upon information and belief, consumers Charles Hall and Suzie Hall, residents of Shelby County, Alabama, wrote Nationstar, in an attempt to determine the status of a loan modification that was not being honored, by way of multiple qualified written requests.  Nationstar did not provide meaningful substantive responses to the inquiries,

and the problems went uncorrected.  This is the subject matter of the case <u>Hall v. Nationstar Mortgage</u>, Case No. 2:14-cv-1893-KOB, N.D. Ala.

n.  Based upon information and belief, consumer John R. Laws II, resident of Cumberland County, North Carolina, wrote to Nationstar regarding an improper payoff statement received from Nationstar, as well as corporate advances and other charges that were not owed by Plaintiffs.  Nationstar acknowledged the letter dated August 16, 2013, and did not reply until May 29, 2014, stating that the error did not occur.  This issue is the subject of the case <u>Laws v. Nationstar Mortgage, LLC</u>, Case No. 14 CVS 9792, General Court of Justice Superior Court Division.

o.  Based upon information and belief, consumers John Berne and Camron Longson, residents of Broward County, Florida, wrote to Nationstar by way of Qualified Written Request/Notice of Error advising Nationstar that a foreclosure complaint and judgment erroneously stated that the consumers had not make their July 2008 and August 2008 payments, when in fact they did.  Nationstar wrote back with an erroneous response, and failed to correct the issue.  The consumers wrote a second notice of error, pointing out that Nationstar's prior response was insufficient, specifically, Nationstar's response that said payments were applied to the consumers' April and May payments was in error because the consumers made those payments as well.  Nationstar replied to the second notice of error stating that it satisfied its duty to respond, and Nationstar did not fix the problem.  This issue is the subject of the case <u>Berne v. Nationstar Mortgage LLC</u>, No. 0:14-cv-61153-RNS, S.D. Fla.

p.  Upon information and belief, consumers Aaron Lee James, Sr. and Willie Mae James, residents of Mobile County, Alabama, wrote to Nationstar by way of notice of error

to request information related to the payment history, statement of missed payments, and identity of the lender.   Nationstar responded to the notice of error with a boilerplate response that indicates that no reasonable investigation was conducted, and Nationstar continued with its errors.   This issue is the subject of the case <u>James v. Nationstar Mortgage, LLC</u>, No. 1:14-cv-545, S.D. Ala.

47.     Pursuant to 12 U.S.C. § 2605(f), Plaintiffs is entitled to actual damages; statutory damages in an amount not to exceed $2,000.00 as a result of pattern and practice; and attorney's fees and costs.

### JURY TRIAL DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

### COUNT II:  VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT—15 U.S.C. § 1692 *et seq.*—AGAINST NATIONSTAR

48.     Plaintiffs re-allege Paragraphs 1-37 here.

49.     Plaintiffs are "consumers," as they are natural persons obligated to pay a debt—the Subject Loan and LMA.

50.     Nationstar is a "debt collector," as the term is used and interpreted under 15 U.S.C. § 1692(a)(6), to wit the Subject Loan was in default upon servicing transfer from BANA to Nationstar. Additionally, Nationstar consistently refers to itself as a debt collector in communications between Plaintiffs and Nationstar—by way of letter and over the phone.

51.     The debt on which Nationstar is attempting to collect is a "debt" within the meaning of section 15 U.S.C. § 1692a(5), as the Subject Loan and LMA on which Nationstar is attempting to collect money by way of monthly statements address an alleged or actual obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which

were the subject of the transaction were primarily for personal, family, or household purposes, as the Subject Loan concerns Plaintiffs' residence.

52.      Nationstar violated § 1692e by using a false, deceptive, and misleading representations and means in connection with debt collection when Nationstar failed to apply Plaintiff's loan payments, and then blamed Plaintiffs for the error, charging them attorney fees, foreclosure fees, late fees, and property inspection fees; by improperly threatening foreclosure; by threatening to file a foreclosure within 14 days when Nationstar had not provided the notice of acceleration required by the Mortgage, which, among other things, calls for 30 days' notice; and by referring the Subject Loan to a foreclosure law firm to file a foreclosure action.

53.      Nationstar violated 1692e(2) by misrepresenting the character, amount, and legal status of the Subject Loan when Nationstar failed to apply Plaintiff's loan payments, and then blamed Plaintiffs for the error, charging them attorney fees, foreclosure fees, late fees, and property inspection fees; by improperly threatening foreclosure; and by threatening to file a foreclosure within 14 days when Nationstar had not provided the notice of acceleration required by the Mortgage, which, among other things, calls for 30 days' notice; and by referring the Subject Loan to a foreclosure law firm to file a foreclosure action.

54.      Nationstar violated 1692e(5) by threatening to take action that cannot legally be taken when Nationstar charged Plaintiffs attorney fees, foreclosure fees, late fees, and property inspection fees; by improperly threatening foreclosure; and by threatening to file a foreclosure within 14 days when Nationstar had not provided the notice of acceleration required by the Mortgage, which, among other things, calls for 30 days' notice; and by referring the Subject Loan to a foreclosure law firm to file a foreclosure action.

55.     Nationstar violated 1692e(8) by threatening to communicate and communicating false credit information, including that the debt is disputed to when Nationstar represented to its foreclosure firm that Plaintiffs had defaulted on the Subject Loan, and that the Subject Loan was ripe for foreclosure.

56.     Nationstar violated 1692e(10) by using a false representation and deceptive means to collect a debt when Nationstar failed to apply Plaintiff's loan payments, and then blamed Plaintiffs for the error, charging them attorney fees, foreclosure fees, late fees, and property inspection fees; by improperly threatening foreclosure; and by threatening to file a foreclosure within 14 days when Nationstar had not provided the notice of acceleration required by the Mortgage, which, among other things, calls for 30 days' notice; and by referring the Subject Loan to a foreclosure law firm to file a foreclosure action.

57.     Nationstar violated 1692f by using unfair and unconscionable means to collect or attempt to collect the alleged debt when Nationstar failed to apply Plaintiff's loan payments, and then blamed Plaintiffs for the error, charging them attorney fees, foreclosure fees, late fees, and property inspection fees; by improperly threatening foreclosure; and by threatening to file a foreclosure within 14 days when Nationstar had not provided the notice of acceleration required by the Mortgage, which, among other things, calls for 30 days' notice; and by referring the Subject Loan to a foreclosure law firm to file a foreclosure action.

58.     Nationstar violated 1692f(1) by attempting to collect an amount not authorized by the agreement creating the debt or permitted by law when Nationstar charged Plaintiffs attorney fees, foreclosure fees, late fees, and property inspection fees; by improperly threatening foreclosure; and by threatening to file a foreclosure within 14 days when Nationstar had not provided the notice of

acceleration required by the Mortgage, which, among other things, calls for 30 days' notice; and by referring the Subject Loan to a foreclosure law firm to file a foreclosure action.

59.    As a proximate result of Nationstar's actions and omissions, Plaintiffs have suffered actual damages in the form of improper and un-owed fees and charges, such as late charges and property inspections, accrued interest as a result of principle not being paid as it would have been paid if Nationstar followed the loan documents.

60.    Plaintiffs have also suffered actual damages in the form of emotional distress and loss of consortium.

61.    Pursuant to 15 U.S.C. § 1692k, Plaintiffs are entitled to actual damages; statutory damages in an amount of up to $1,000; and attorney's fees and costs.

**Trial by Jury**:  Plaintiff are entitled to and hereby respectfully demand a trial by jury on all issues so triable.  U.S. Const. amend. 7; Fed. R. Civ. P. 38; Fla R. Civ. P. 1.430.

### COUNT III:  VIOLATIONS OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT—§§ 559.55-.785, FLA. STAT ("FCCPA")—AGAINST NATIONSTAR

62.    Plaintiffs re-alleges Paragraphs 1-37 here.

63.    At all times material, pursuant to section 559.55(2), Florida Statutes, Plaintiffs were "consumers," as Plaintiffs were natural persons actually or allegedly obligated to pay a debt—the Subject Loan and LMA concerning Plaintiffs' primary residence.

64.    The Subject Loan on which Nationstar attempted to collect money was a "consumer debt" within the meaning of section 559.55(1), as the Subject Loan and LMA address an actual or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which were the subject of the transaction were primarily for personal, family, or household purposes, as the Subject Loan concerns Plaintiffs' residence.

65.     Nationstar violated sections 559.72(5), (6) when Nationstar represented to its foreclosure firm that Plaintiffs had defaulted on the Subject Loan, and that the Subject Loan was ripe for foreclosure, while knowing that this information was false, as Nationstar is party to the LMA and when Plaintiffs notified Nationstar numerous times.

66.     Nationstar violated section 559.72(9) by attempting to enforce a debt when Nationstar failed to apply Plaintiff's loan payments, and then blamed Plaintiffs for the error, charging them attorney fees, foreclosure fees, late fees, and property inspection fees; by improperly threatening foreclosure; and by threatening to file a foreclosure within 14 days when Nationstar had not provided the notice of acceleration required by the Mortgage, which, among other things, calls for 30 days' notice.  Nationstar had the requisite knowledge by way of being party to, and knowing about, the LMA—especially after Plaintiffs reminded Nationstar of the LMA, but Nationstar continued its course of conduct anyway.

67.     As a proximate result of Nationstar's actions and omissions, Plaintiffs have suffered actual damages in the form of improper and un-owed fees and charges, such as late charges and property inspections, accrued interest as a result of principle not being paid as it would have been paid if Nationstar followed the loan documents.

68.     Plaintiffs have also suffered actual damages in the form of emotional distress and loss of consortium.

69.     Pursuant to section 559.77, Plaintiffs are entitled to actual damages; statutory damages in an amount of up to $1,000.00; and attorney's fees and costs.

**Trial by Jury**:  Plaintiffs are entitled to and hereby respectfully demand a trial by jury on all issues so triable.  U.S. Const. amend. 7; Fed. R. Civ. P. 38; Fla R. Civ. P. 1.430.

**COUNT IV:  VIOLATIONS OF THE TRUTH IN LENDING ACT ("TILA")—12 C.F.R. § 1026.41—AGAINST FNMA**

70.       Plaintiffs re-allege Paragraphs 1-37 here.

71.       The Subject Loan and LMA involve a closed-end "consumer credit" transaction, as credit was offered or extended to a consumer primarily for personal, family, or household purposes— Plaintiffs' primary residence.  § 1026.41(a)(1).  Said transaction is secured by a "dwelling," as Plaintiffs' primary residence is a residential structure containing one to four units attached to real property, which is encumbered by a Mortgage which secures the Note.  Id.  This closed-ended consumer credit transaction secured by a dwelling is a "mortgage loan." Id.

72.       At all times material, FNMA was an "assignee" and "owner" of the Subject Loan and LMA, and thus is a "servicer" as defined by 12 C.F.R. § 1026.41.

73.       At all times material, Plaintiffs were "consumers," as they were natural persons to whom consumer credit is offered or extended—the Subject Loan and LMA.

74.       "A servicer of a transaction subject to this section shall provide the consumer, for each billing cycle, a period statement meeting the requirements of paragraphs (b), (c), and (d) of this section." § 2026.41(a)(2).  Plaintiffs' billing cycle is monthly.

75.       At all material times the Subject Loan and LMA was a federally related mortgage loan:  the Subject Loan was not for temporary financing such as a construction loan, was secured by a first lien on residential property designed for the occupancy of one to four families, and was serviced by a lender/servicer that is regulated by the federal government.

76.       "The periodic statement must be delivered or placed in the mail within a reasonably prompt time after the payment due date or the end of any courtesy period provided for the previous billing cycle." § 1026.41(b).  The end of the courtesy period for the Subject Loan is on the 16th day of any given month.  Defendants did not send periodic statements to Plaintiffs since June of 2015.

77.      In the periodic statements, Defendants are required to inform Plaintiff of the amount due, explanation of amount due, past payment breakdown, transactional activity, partial payment information, contact information, account information, and delinquency information.  § 1026.41(b). Defendants did not do so in the months identified in the immediately preceding paragraph.

78.      Plaintiffs have not received periodic statements and the information that would have been contained therein might have caused Plaintiffs to act differently than they did, and as a result, problems such as changes in escrow, or even improper fees and charges, could have been made to avoid further problems, such as accrual of more improper default-related fees and costs that accrued because of misapplication of payments.

79.      Pursuant to 15 U.S.C. § 1640(a), Plaintiffs are entitled to actual damages; statutory damages in an amount of not less than $400.00 or greater than $4,000.00; and attorney's fees and costs.

## JURY TRIAL DEMAND

Plaintiffs demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

a)  judgment be entered against Nationstar for an award of actual damages and statutory damages of $2,000.00 per Plaintiff as a result of Nationstar's pattern and practice, and costs and reasonable attorney's fees pursuant to 12 U.S.C. § 2605(f);

b)  judgment be entered against FNMA for an award of actual damages and statutory damages of $4,000.00 for each Plaintiff, and costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1640(a);

c) judgment be entered against Nationstar for an award of statutory damages of $1,000.00 pursuant to Florida Statutes § 559.77(2); for an award of actual damages, and for an award of litigation costs and reasonable attorney's fees for each Plaintiffs; injunctive and declaratory relief regarding Nationstar properly applying Plaintiffs' payments and correcting Plaintiffs' Subject Loan such that it is current—specifically rectification of all fees and costs that accrued because of Nationstar failing to apply payments in accordance with the LMA;

d) judgment be entered against Nationstar for an award of statutory damages of $1,000.00 for each Plaintiff pursuant to 15 U.S.C. § 1692k(a)(2)(A); an award of actual damages, and for an award of litigation costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1692k(a)(3); and

e) any other relief that the Court deems proper.

Respectfully submitted,

**PARKER & DUFRESNE, P.A.**

_____/s/ Austin Brown_____

❑ E. Warren Parker, Jr., Esquire
Florida Bar Number: 958506
❑ Austin T. Brown, Esquire
Florida Bar Number: 96633
8777 San Jose Blvd., Ste. 301
Jacksonville, Florida 32217
Tel: (904)733-7766; Fax: (904)733-2919
Primary service@jaxlawcenter.com
Secondary parker.dufresne@gmail.com
Attorneys for Plaintiffs

Exhibit A

After Recording Return To:
**PROVIDENT FUNDING ASSOCIATES, L.P.**
**PO BOX 5913**
**SANTA ROSA, CA 95402-5913**

Loan No. ███████████

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN ████████████████

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.
**(A) "Security Instrument"** means this document, which is dated 4/20/2007 , together with all Riders to this document.
**(B) "Borrower"** is RAYMOND P LUTZEN AND PAMELA L LUTZEN, HUSBAND AND WIFE . Borrower is the mortgagor under this Security Instrument.

**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D) "Lender"** is PFG LOANS, INC. A DBA OF PROVIDENT FUNDING GROUP, INC.. Lender is a CORPORATION organized and existing under the laws of CALIFORNIA. Lender's address is 9428 BAYMEADOWS RD, SUITE 105, JACKSONVILLE, FL 32256.
**(E) "Note"** means the promissory note signed by Borrower and dated 4/20/2007. The Note states that Borrower owes Lender TWO HUNDRED FOUR THOUSAND AND 00/100 Dollars (U.S. $204,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than 5/1/2037.
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property".
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01 *(page 1 of 13 pages)*

0010FL.doc - 5/17/2002 4:26 PM          Borrower Initials _____ _____ _____ _____
p - 4/17/2007                                                                        Ver. 1

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

( ) Adjustable Rate Rider ( )Condominium Rider ( ) Second Home Rider
( ) Balloon Rider (X)Planned Unit Development Rider ( ) Other(s) [specify]
( )1-4 Family Rider ( ) Biweekly Payment Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** mean those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally regulated mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the county of  DUVAL                                                                       :

**LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS EXHIBIT "A".**
**PLANNED UNIT DEVELOPMENT RIDER ATTACHED HERETO AND MADE A PART HEREOF.**

which currently has the address of  ████████████████████████

("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property". Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01 *(page 3 of 13 pages)*

0010FL.doc - 5/17/2002 4:26 PM
p - 4/17/2007

Borrower Initials _/C/C_  _ᑕᒪ_ ·_____  _____ Ver. 1

rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items". At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                     Form 3010  1/01  *(page 4 of 13 pages)*

0010FLA.doc - 5/17/2002 4:26 PM
p - 4/17/2007                                                        Borrower Initials _LPC_  _TLL_  _____  _____
                                                                                                    Ver. 1

the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT               Form 3010  1/01 *(page 5 of 13 pages)*

additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until the Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010 1/01 *(page 7 of 13 pages)*

0010FL.doc - 5/17/2002 4:26 PM
p - 4/17/2007

Borrower Initials _R/C_ _DLL_ _____ _____ _____

Ver. 1

takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has– if any– with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or, loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgement, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this

Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Attorneys' Fees.** As used in this Security Instrument and the Note, "attorneys' fees" shall include any attorneys' fees awarded by an appellate count and any attorneys' fees incurred in a bankruptcy proceeding.

**25. Jury Trial Waiver.** The Borrower hereby waives all rights to a trial by jury in any action, proceeding, claim, or counterclaim, whether in contract or tort, at law or in equity, arising out of or in any way related to this Security Instrument or the Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
Michael D. Coonan                        RAYMOND P LUTZEN              -Borrower

_____          _____ (Seal)
Heather Nelson                                                        -Borrower

_____          _____ (Seal)
                                                                      -Borrower

_____          _____ (Seal)
                                                                      -Borrower

_____          _____
                                         PAMELA L LUTZEN

_____          _____

## ACKNOWLEDGEMENT

STATE OF FLORIDA, _DUVAL_____ County ss:

The foregoing instrument was acknowledged before me this day of ___4/20/07_____ by

RAYMOND P LUTZEN                         PAMELA L LUTZEN

who is personally known to me or who has produced _Drivers License_____ as identification.



```
MICHAEL D. COONAN
MY COMMISSION # DD 639766
EXPIRES: May 11, 2011
Bonded Thru Notary Public Underwriters
```

_____
Notary Public

FLORIDA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3010  1/01  (page 13 of 13 pages)

0010FL.doc - 5/17/2002 4:26 PM
p - 4/17/2007                                                                            Ver. 1

# PLANNED UNIT DEVELOPMENT RIDER

Loan N ███████████

THIS PLANNED UNIT DEVELOPMENT RIDER is made 4/20/2007, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to PFG LOANS, INC. A DBA OF PROVIDENT FUNDING GROUP, INC. (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

███████████████████

(Property Address)

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in covenants, conditions, and restrictions (the "Declaration"). The Property is a part of a planned unit development known as

JOHNS CREEK

(Name of Planned Unit Development)

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance then: (i) Lender waives the provision in the Section 3 for the yearly payment to Lender of the yearly premium installments for property insurance on the Property; and; (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

---

**MULTISTATE PUD RIDER** - Single Family – **Fannie Mae/Freddie Mac UNIFORM INSTRUMENT** Form 3150 1/01

Page 1 of 2

Borrowers Initials: _MPL_ _PLL_

Ver. 1

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination or the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)     _____ (Seal)
PAMELA L LUTZEN                               RAYMOND P LUTZEN

_____ (Seal)     _____ (Seal)

_____ (Seal)     _____ (Seal)

_____ (Seal)     _____ (Seal)

# Exhibit "A"

File Number: 2007-087

Lot 143, Johns Creek, Unit Three, according to plat thereof as recorded in Plat Book 51, Pages 73, 73A through 73H inclusive of the Current Public Records of Duval County, Florida.

After Recording Return To:
NATIONSTAR MORTGAGE LLC
350 HIGHLAND DRIVE
LEWISVILLE, TX 75067

This Document Prepared By:
NATIONSTAR MORTGAGE LLC
350 HIGHLAND DRIVE
LEWISVILLE, TX 75067
Tatiana Vakidis

Parcel ID Number:

_____ [Space Above This Line For Recording Data] _____

Original Loan Amount: $204,000.00                         **Loan No:** ▮▮▮▮
New Money: $37,065.06                          Investor Loan No: ▮▮▮▮
                                                              MIN Number: ▮▮▮▮

# LOAN MODIFICATION AGREEMENT
## (Providing for Fixed Interest Rate)

This Loan Modification Agreement ("Agreement"), made this 30th day of May, 2014, between **RAYMOND LUTZEN** ("Borrower") and **NATIONSTAR MORTGAGE LLC, whose address is 350 HIGHLAND DRIVE, LEWISVILLE, TX 75067** ("Lender"), and Mortgage Electronic Registration Systems, Inc. ("MERS"), and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS, ("Mortgagee"), amends and supplements (1) the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), and Timely Payment Rewards Rider, if any, dated _June 17_, _2014_ and recorded in Book/Liber N/A of the Official Records (Name of Records) of _Duval_ County, FL (County and State, or other Jurisdiction) and (2) the Note, bearing the same date as, and secured by, the Security Instrument, which covers the real and personal property described in the Security Instrument and defined therein as the "Property", located at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

the real property described being set forth as follows:

In consideration of the mutual promises and agreements exchanged, the parties hereto agree as follows (notwithstanding anything to the contrary contained in the Note or Security Instrument):



LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae Uniform Instrument
8300s 01/14



Form 3179 1/01 (rev. 08/12)
*(page 1 of 7)*

1.  As of **June 1, 2014**, the amount payable under the Note and the Security Instrument (the "Unpaid Principal Balance") is U.S. **$249,986.99**, consisting of the unpaid amount(s) loaned to Borrower by Lender plus any interest and other amounts capitalized.

2.  Borrower promises to pay the Unpaid Principal Balance, plus interest, to the order of Lender. Interest will be charged on the Unpaid Principal Balance at the yearly rate of **4.625%**, from **June 1, 2014**. Borrower promises to make monthly payments of principal and interest of U.S. **$1,144.01**, beginning on the **1st** day of **July, 2014**, and continuing thereafter on the same day of each succeeding month until principal and interest are paid in full. The yearly rate of **4.625%** will remain in effect until principal and interest are paid in full. If on **June 1, 2054** (the "Maturity Date"), Borrower still owes amounts under the Note and the Security Instrument, as amended by this Agreement, Borrower will pay these amounts in full on the Maturity Date.

3.  If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by the Security Instrument.

    If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by the Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower.

4.  Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, including without limitation, Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that Borrower is obligated to make under the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the date specified in paragraph No. 1 above:

    (a)  all terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note, including, where applicable, the Timely Payment Rewards rate reduction, as described in paragraph 1 of the Timely Payment Rewards Addendum to Note and paragraph A.1. of the Timely Payment Rewards Rider. By executing this Agreement, Borrower waives any Timely Payment Rewards rate reduction to which Borrower may have otherwise been entitled; and

    (b)  all terms and provisions of any adjustable rate rider, or Timely Payment Rewards Rider, where applicable, or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.

5.  Borrower understands and agrees that:

(a)     All the rights and remedies, stipulations, and conditions contained in the Security Instrument relating to default in the making of payments under the Security Instrument shall also apply to default in the making of the modified payments hereunder.

(b)     All covenants, agreements, stipulations, and conditions in the Note and Security Instrument shall be and remain in full force and effect, except as herein modified, and none of the Borrower's obligations or liabilities under the Note and Security Instrument shall be diminished or released by any provisions hereof, nor shall this Agreement in any way impair, diminish, or affect any of Lender's rights under or remedies on the Note and Security Instrument, whether such rights or remedies arise thereunder or by operation of law. Also, all rights of recourse to which Lender is presently entitled against any property or any other persons in any way obligated for, or liable on, the Note and Security Instrument are expressly reserved by Lender.

(c)     Nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the Note and Security Instrument.

(d)     All costs and expenses incurred by Lender in connection with this Agreement, including recording fees, title examination, and attorney's fees, shall be paid by the Borrower and shall be secured by the Security Instrument, unless stipulated otherwise by Lender.

(e)     Borrower agrees to make and execute such other documents or papers as may be necessary or required to effectuate the terms and conditions of this Agreement which, if approved and accepted by Lender, shall bind and inure to the heirs, executors, administrators, and assigns of the Borrower.

(f)     "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns. **MERS is the Mortgagee, of record under the Security Instrument and this Agreement.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

6.     In the event that I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the loan documents and did not reaffirm the mortgage debt under applicable law, Lender agrees that I will not have personal liability on the debt pursuant to this Agreement.

7.     By this paragraph, Lender is notifying Borrower that any prior waiver by Lender of Borrower's obligation to pay to Lender Funds for any or all Escrow Items is hereby revoked, and Borrower has been advised of the amount needed to fully fund the Escrow Items.

8.     Pursuant to Section 199.145(4)(b), Florida Statutes, additional nonrecurring intangible tax is due. This Mortgage is given in connection with the refinancing of an obligation secured by an existing

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae Uniform Instrument
8300a 01/14

Form 3179 1/01 (rev. 06/12)
*(page 3 of 7)*

mortgage, recorded in Official Records Book N/A, Public Records of  County, Florida from the Mortgagor hereunder to the Mortgagee hereunder, or to the assignor of the Mortgagee hereunder.  As of the date of refinancing, the unpaid principal balance of the original obligation, plus accrued by unpaid interest, secured by the existing mortgage is equal to $212,901.91.  The principal balance of the new obligation secured by this Mortgage is $249,986.99, which amount represents, as of the refinancing, the excess of the unpaid principal balance of the original obligation, plus accrued by unpaid interest.  Notwithstanding anything to the contrary contained in the foregoing, if the obligor under the new obligation is not liable to the obligee under the obligation secured by this Mortgage, then the additional nonrecurring intangible tax shall be computed on the entire principal balance of the new obligation.



LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae Uniform Instrument
8300a 01/14



Form 3179 1/01 (rev. 06/12)
*(page 4 of 7)*

In Witness Whereof, the Lender and I have executed this Agreement.

_____ (Seal)
**RAYMOND LUTZEN** -Borrower

_____ -Witness          _____ -Witness
Signature                               Signature

_____ -Witness          _____ -Witness
Print Name                              Print Name
VICTORIA C. HATCH

_____ FL _____ [Space Below This Line For Acknowledgments] _____
State of Florida

County of ___DUVAL___                   ss.

The foregoing instrument was acknowledged before me, Notary Public this _17_ day of
_June_____, 20_14_, by **RAYMOND LUTZEN** who is personally known to me or who has
produced _Drivers License_ as identification.

_____
(Signature of person taking acknowledgment)

_____
J H Rivera
(Name typed printed or stamped)

_____
Notary
(Title or Rank)

_____
(Serial Number if any)
My Commission expires : _3/3/2018_

J H RIVERA
Notary Public - State of Florida
My Comm. Expires Mar 3, 2018
Commission # FF 068300
Bonded Through National Notary Assn.

LOAN MODIFICATION AGREEMENT—Single Family—Fannie Mae Uniform Instrument
8300a 01/14

Form 3179 1/01 (rev. 06/12)
(page 5 of 7)

**NATIONSTAR MORTGAGE LLC**

By: _____ (Seal) - Lender
Name: Bianca Hockensmith
Title: Assistant Secretary

1/28/14
Date of Lender's Signature

_____ [Space Below This Line For Acknowledgments] _____

The State of TX

County of Denton

Before me Enadia T. Pierce/Notary Public (name/title of officer) on this day personally appeared

Bianca Hockensmith , the Assistant Secretary of

Nationstar Mortgage LLC

known to me (or proved to me on the oath of _____ or through _____
(description of identity card or other document)) to be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that he executed the same for the purposes and
consideration therein expressed.

Given under my hand and seal of office this 30 day of June , A.D. 2014.

ENADIA T. PIERCE
Notary Public, State of Texas
My Commission Expires
October 09, 2017

_____
Signature of Officer

Notary Public
Title of Officer

My Commission expires : 10|9|2017

Bianca Hockensmith

6/28/14

Mortgage Electronic Registration Systems, Inc - Nominee for Lender

Title: **Assistant Secretary**

_____ [Space Below This Line For Acknowledgments] _____

The State of TX

County of _Denton_

Before me _____ _Notary Public_ (name/title of officer) on this day personally appeared

Bianca Hockensmith , the **Assistant Secretary** of

Mortgage Electronic Registration System, Inc.

known to me (or proved to me on the oath of _____ or through _____
(description of identity card or other document)) to be the person whose name is subscribed to the
foregoing instrument and acknowledged to me that he executed the same for the purposes and
consideration therein expressed.

Given under my hand and seal of office this 30 day of June , A.D. 2014

ENADIA T. PIERCE
Notary Public, State of Texas
My Commission Expires
October 09, 2017

_____
Signature of Officer

_Notary Public_
Title of Officer

My Commission expires : 10 9 2017

Loan Number: ██████
Lender: NATIONSTAR MORTGAGE LLC

Date: May 30, 2014

Borrower: RAYMOND LUTZEN

Property Address: ████████████████████

## Florida
## Affidavit of Continuous Marriage

STATE OF FLORIDA

COUNTY OF DUVAL

BEFORE ME, the undersigned Notary Public, personally known to me or who had produced Drivers license as identification appeared **RAYMOND LUTZEN**, (hereinafter "Affiant"), who being by me first duly sworn, deposes and says:

1. Affiant is over the age of eighteen (18) years.

2. This Affidavit pertains to the following real property: ████████████████
   ██████

3. Affiant is executing this Affidavit for the purpose of establishing in the public records that he/she is married to Pemela Lutzen, and such marriage has been continuous and uninterrupted from a date prior to his/her acquisition of the above-described property through the date of this Affidavit.

4. Affiant is aware that grantee/lender and _____ Title Insurance Company are relying upon this Affidavit to issue title insurance policies without exception to the matter(s) noted above.

5. Affiant is familiar with the nature of an oath and with the penalties provided by the laws of the State of Florida for falsely swearing to statements made in an Affidavit of this nature.

Affiant has caused this Affidavit to be executed this _17_ day of _June_, 20 _14_.

_____
RAYMOND LUTZEN

SWORN TO AND SUBSCRIBED before me this _17_ day of _JUNE_, 20 _14_.

J H RIVERA
Notary Public - State of Florida
My Comm. Expires Mar 3, 2018
Commission # FF 008300
Bonded Through National Notary Assn.

_____
Notary Public
My Commission Expires: 3/3/18

8376 11/12

Loan No.: ▮▮▮▮▮▮▮
Borrower: RAYMOND LUTZEN

## AGREEMENT TO MAINTAIN ESCROW ACCOUNT

WHEREAS, RAYMOND LUTZEN ("Borrower") desires NATIONSTAR MORTGAGE LLC ("Lender") to collect payments from Borrower to be held by Lender for the payment of certain sums due in connection with Borrower's Note and Security Instrument, dated ⎯June 17⎯, 2014 (hereinafter referred to as "Note" and "Security Instrument" respectively) currently held by Lender;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants contained in this Agreement ("Agreement"), Borrower agrees to pay Lender, on the day Periodic Payments are due under the Note, until the Note is paid in full, or the Escrow Account is otherwise terminated pursuant to this Agreement or in accordance with applicable law, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Security Instrument; and (d) Mortgage Insurance Premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums. These items are called "Escrow Items." In the event that Borrower receives bills, assessments, invoices, or other requests for payment of Escrow Items, Borrower shall promptly furnish to Lender all such notices.

Borrower shall pay Lender the Funds for Escrow Items unless this Agreement is terminated either by Lender, or pursuant to applicable law. In the event of termination, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. In the event Borrower is obligated to pay Escrow Items directly, and Borrower fails to pay the amount due for an Escrow Item, Lender may pay such amount in accordance with the terms of the Note and Security Instrument and Borrower shall then be obligated to repay Lender any such amount. Additionally, if Borrower is obligated to pay Escrow Items directly, and Borrower fails to pay the amount due for an Escrow Item, Lender may, in accordance with applicable law, require Borrower to maintain an Escrow Account.

Borrower agrees to make an initial payment of Funds to establish the escrow account, which amount shall be based on an estimate of the amount and date of expenditures for future Escrow Items, or otherwise in accordance with the Real Estate Settlement Procedures Act ("RESPA"). The estimate of expenditures of future Escrow Items shall be made based on current data available to Lender. Borrower acknowledges that the actual payments of Escrow Items may vary from the estimated amounts.

Lender will collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time period specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Unless agreed to in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to



AGREEMENT TO ESTABLISH ESCROW ACCOUNT 11/12



(Page 1 of 2)

Loan No. █████████

Borrower: RAYMOND LUTZEN

Lender the amount necessary to make up the shortage in accordance with RESPA. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument or termination of this Agreement, Lender shall promptly refund to Borrower any Funds held by Lender.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Agreement to Maintain Escrow Account.

_____        _____
Borrower - RAYMOND LUTZEN                        6/17/14
                                                 Date

_____        _____
Borrower -                                       Date

_____        _____
Borrower -                                       Date

_____        _____
Borrower -                                       Date



*60928171 2*
AGREEMENT TO ESTABLISH ESCROW ACCOUNT 11/12

*118634+10*
(Page 2 of 2)

Loan No.: ████
Borrower: RAYMOND LUTZEN

# COMPLIANCE AGREEMENT

In consideration of Nationstar Mortgage LLC ("Lender") extending funds (the "Loan"), in connection with the closing of the property located at 12868 KELSEY ISLAND DR, JACKSONVILLE, FL 32224 (the "Closing"), the undersigned ("Borrower") agrees, upon request of Lender, its successors or assigns ("Note Holder"), or upon request of any person acting on behalf of Note Holder, to fully cooperate with Note Holder or such person to correct any inaccurate term or provision of, mistake in, or omission from any document associated with the Closing. Borrower further agrees to execute such documents or take such action as Note Holder or such person acting on behalf of Note Holder reasonably may deem necessary (including without limitation the correction of any such inaccuracy, mistake, or omission) as will enable Note Holder to sell, convey, seek guaranty of, or market the Loan to any entity, including without limitation an investor, the Federal National Mortgage Association, the Government National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Department of Housing and Urban Development, the Department of Veterans Affairs, or any bonding authority.

Borrower further agrees to comply with any such request within a reasonable period of time as specified by Note Holder or by such person acting on behalf of Note Holder. Failure to comply shall constitute default under the Note and Security Instrument that evidence the Loan, and Note Holder may pursue its available remedies.

BY SIGNING BELOW BORROWER ACKNOWLEDGES THAT BORROWER FULLY UNDERSTANDS THIS COMPLIANCE AGREEMENT OR OTHERWISE HAS SOUGHT THE ADVISE OF COUNSEL.

_Raymond Lutzen_             _6/13/14_
Borrower - RAYMOND LUTZEN            Date

_____         _____
Borrower -                                        Date



COMPLIANCE AGREEMENT 11/12



(Page 1 of 1)